UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                          :

IN RE MOLYCORP, INC.                  :
SECURITIES LITIGATION           :
                          :

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3 - 12 - 15

13 Civ. 5697 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiffs in this putative class action allege that Molycorp Inc. ("Molycorp"),

Constantine Karayannopoulos, Mark A. Smith, Michael F. Doolan, John L. Burba, and John F.

Ashburn (the "Individual Defendants," and collectively with Molycorp, the "Defendants")

violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder (Count One), and

§ 20(a) of the Exchange Act (Count II). Plaintiffs, who purchased Molycorp's common stock

between February 21, 2012 and October 15, 2013 (the "Class Period"), claim that Defendants

made material misstatements and omissions during the Class Period regarding: (1) the progress

of the first phase of Project Phoenix, an effort to modernize Molycorp's rare earths mine in

Mountain Pass, California to expand its production capacity; (2) the amount of inventory carried

on Molycorp's balance sheet and its cost of sales in the first quarter of 2013; and (3) Molycorp's

progress in building commercial potential for SorbX, Molycorp's proprietary water filtration

product made of cerium gleaned from Molycorp's Mountain Pass mine.

In January of 2013, after Project Phoenix should already have been completed, Molycorp

announced that the project would not be completed for another six months, at which point the

stock price fell 22.7% in one day.  Likewise, the stock price dropped almost ten percent

1

following Molycorp's announcement that it was restating its financial results from the first quarter of 2013. Similarly, in October 2013, when Molycorp announced that SorbX had not yet achieved meaningful commercial potential, the stock price fell 21.4%, to $5.58.

Defendants move, pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), to dismiss the Consolidated Amended Class Action Complaint (the "Complaint"). As discussed below, the Complaint is dismissed because Plaintiffs have insufficiently pled scienter with respect to the Project Phoenix statements and the restatement of financial results, and the statements regarding SorbX are protected forward-looking statements.

## FACTS

The allegations in the Complaint, taken as true for the purposes of the motion to dismiss, reflect the following.[1]

### A. Background[2]

Molycorp, a Delaware corporation with headquarters in Greenwood Village, Colorado, produces and sells rare earth and rare metal products. Compl. ¶¶ 18, 39-40. These products are used in clean energy technologies, high-tech devices, critical defenses applications, and advanced water treatment technology. *Id.* ¶ 39. Molycorp's Resources segment extracts rare earth minerals, which Molycorp then markets and sells. *Id.* ¶ 40.

---

[1] The Court also includes information from Securities and Exchange Commission ("SEC") filings by Molycorp, which Plaintiffs refer to in their Complaint. *See Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 707 (2d Cir. 2011).
[2] The Complaint includes allegations from ten confidential witnesses ("CWs"). Plaintiffs identify the confidential witnesses by their dates of employment, positions, and direct supervisors. Compl. ¶¶ 28-38. The Court accepts the allegations of the confidential witnesses, as the information provided "is sufficient to support the probability that someone in their position would possess the information they each have alleged." *In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, at *9 (S.D.N.Y Jan. 20, 2015) (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).

Karayannopoulos is currently the Chairman of the Board of Molycorp, and served as Vice Chairman and Director starting in June 2012, and Interim President and Chief Executive Officer from December 2012 until December 2013. *Id.* ¶ 19. Smith served as Molycorp's Chief Executive Officer until December 2012. *Id.* ¶ 20. Doolan has been Executive Vice President and Chief Financial Officer of Molycorp since June 2012, and its Principal Accounting Officer since August 2012. *Id.* ¶ 21. Burba served as Molycorp's Executive Vice President and Chief Technology Officer from December 2009 until March 2013. *Id.* ¶ 22.

## B. Project Phoenix

In 2010, prior to the Class Period, Molycorp announced a "plan to reopen and modernize its long-closed mining facility in Mountain Pass, California, which had been previously shuttered in 2002 due to, among other factors, low demand for rare earths." *Id.* ¶¶ 43, 45. This plan was triggered by the Chinese government's 2010 announcement of new restrictions and export quotas on rare earth metals from China, which provided a favorable market position for non-Chinese rare earth producers. *Id.* ¶ 42. Molycorp named the project "Project Phoenix,"[3] and it was intended to increase the run rate of the facility from approximately 3,000 metric tons ("mt") to 19,050 mts of rare earth oxides per year. *Id.* ¶ 45. The production increase was deemed "Phase 1" of Project Phoenix. *Id.* ¶ 46. This project "was expected to take eighteen months and cost \$531 million to complete." *Id.* ¶ 45. In its Form 10-K (Annual Report) for the period ending December 31, 2010, Molycorp stated that "[t]here is no assurance that we will be able to successfully implement our capacity expansion plan within our current timetable." Levin Decl., Ex. D at 19.

---

[3] A phoenix is a mythical creature which achieves a new life by rising from its ashes. This lawsuit may be said to deal with a phoenix's delayed lift off.

On February 21, 2012, Molycorp issued a press release, quoting Smith, stating that
Project Phoenix was "on track to achieve its full Phase 1 annual production rate of 19,050 mt of
rare earth oxide equivalent by the end of the third quarter of 2012." Compl. ¶ 49. This time
table was frequently repeated and confirmed by Individual Defendants. For example, on
February 23, 2012, during a conference call with investors to discuss Molycorp's financial
results, Smith stated, "[W]e've accelerated the Project Phoenix modernization and expansion of
our flagship Mountain Pass facility, which remained on time for a Phase 1 production rate of
19,050 metric tons by the end of third quarter 2012." *Id.* ¶ 51. He also stated that "we succeeded
in launching the formal start up of our new Project Phoenix facility this week with early stage
operations such as mining, crushing and initial cracking [leaching] operations now underway . . .
I am pleased to note that this sequential start up of Project Phoenix has occurred well in advance
of our previously announced April 1, 2012 timeline." *Id.* ¶ 52. A 10-K filed on February 28,
2012, again warned investors that "[t]here is no assurance that we will be able to successful
implement Project Phoenix Phase 1 . . . within our current timetable," and that any unanticipated
delays of Phase 1 would adversely affect Molycorp's financial condition. Levin Decl., Ex. E at
19-20.

A confidential witness alleges that the press release, and Smith's statements, were
misleading because the leaching process was not running at the time; that the development of the
leaching process was plagued with problems throughout 2012; and that by August of 2012
management realized that the process as designed would not work. Compl. ¶¶ 52-53. The same
witness alleges that despite Smith's statement that the leach process was operational in February
2012, as late as January 2013, the process was only running at a tenth of its capacity. *Id.* ¶ 53.
Molycorp continued to reiterate this timetable for the project, however, filing Form 10-Ks and

Form 10-Qs (Quarterly Reports) with the SEC with similar language and including the same information in press releases to investors. *Id.* ¶¶ 54-55.

These SEC forms were certified by certain Individual Defendants pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). *Id.* ¶¶ 54-56. On May 10, 2012, Molycorp filed a Quarterly Report with the SEC, which stated that Molycorp "expect[s] our labor and benefits costs to increase through at least 2012 due to the addition of personnel and contractors required to implement Project Phoenix Phase 1 and Project Phoenix Phase 2." *Id.* ¶ 56. This statement also reiterated the schedule for Molycorp's accelerated modernization plan. *Id.* ¶ 57. On May 10, 2012, Molycorp issued a press release announcing its financial results for the first quarter of 2012, quoting Smith as saying, "The start of 2012 has been tremendously productive as we continue to hit each of our major milestones on the path to completion of Project Phoenix." *Id.* ¶ 58. The release went on to say that "the Company anticipates no material changes to its Project Phoenix . . . capital budget." *Id.* In a conference call with investors on May 10, 2012, Smith stated that "[w]e remain on track for Phase 1 operations by the beginning of the fourth quarter." *Id.* ¶ 59. He highlighted how smoothly the modernization was going, and praised the work of "the more than 1,850 employees and contractors working daily" on Phase 1. *Id.* Another press release issued on August 2, 2012 reiterated the previously stated schedule for Project Phoenix. *Id.* ¶ 60. That press release, however, identified a fourth quarter completion date for Phase 1, when it previously had been scheduled to be completed in the third quarter of 2012. *Id.* ¶ 61. On August 9, 2012, an SEC filing stated that Molycorp's labor and benefits costs would again increase through "at least 2012" because of additional personnel and contractors necessary to complete Project Phoenix. *Id.* ¶ 63. Press releases issued on August 27, 2012 and August 29, 2012 reiterated that Project Phoenix remained on schedule. *Id.* ¶¶ 64-65. Both the August 9 and

August 29 documents mentioned that it was a possibility that the projected schedule would not be met. *See* Levin Decl., Ex. L at 35; Ex. M at 1-2.

Confidential witnesses contend that by early 2012, Defendants knew that there would be delays to Phase 1 because of serious problems in work performed by a contractor, M&K Chemical Engineering. Compl. ¶¶ 67-70. On May 18, 2012, Molycorp terminated M&K, *id.* ¶ 67, and on October 31, 2012, Molycorp sued M&K in the United States District Court for the District of Colorado, *id.* ¶ 105. From November 1 to November 2, 2012, Molycorp's stock dropped 6.7%. *Id.* ¶ 106. Molycorp made no public announcement regarding the suit until November 5, when the company issued a press release informing the public of the suit, but stating that these problems would not impact the timing of plans to increase production at Mountain Pass. *Id.* ¶ 107. On November 8, 2012, Smith stated on a conference call with investors that M&K's poor workmanship would cost Molycorp approximately $150 million in damages. *Id.* ¶ 109. In that same conference call, when asked whether Phase 1 would be complete by the beginning of the fourth quarter of 2012, Smith stated, "I think what we've been saying is that we will have Phase 1 up and running in the fourth quarter. And we are still on track to achieve that." *Id.* ¶ 114. From November 8 to November 9, 2012, Molycorp's stock dropped 14%. *Id.* ¶ 111.

Molycorp reiterated this timetable for Phase 1 in a November 9, 2012 10-Q, a November 23 Form S-4, and a December 11, 2012 press release. *Id.* ¶¶ 116-19. In the December 11 press release, Molycorp announced that Smith had left the company and that Karayannopolous would replace Smith temporarily. *Id.* ¶ 120. JPMorgan analyst Michael Gambardella stated that the reason for Smith's departure was that he had "lost credibility with a number of constituents, shareholders, potential investors and analysts." *Id.* This press release again acknowledged the

possibility that the project would not be completed on schedule. *See* Levin Decl., Ex. O at 2. On December 12, 201[2],[4] Molycorp's stock fell from $11.33 to $10.99 and to $10.24 the following day. Compl. ¶ 121.

Plaintiffs allege that this was but one example of information regarding the project's progress that Molycorp failed to disclose, as the project was plagued with disorganization and poor contracting work. *Id.* ¶¶ 71-104. For example, one confidential witness alleges that "the rare earth mine was shut down for one and a half months in the last quarter of 2012, thereby making it impossible to meet the Phase 1 target date." *Id.* ¶ 85. Likewise, the "caustic crack program," which was Burba's "'baby,'" never worked, although $100 million was spent on building a plant for the program, for which management had not done the proper due diligence. *Id.* ¶ 93. Confidential witnesses allege that Burba was involved with all of the operations of the mine and knew about the delays, and that Burba reported numbers regarding the project's progress to Smith. *Id.* ¶ 88.

One witness alleges that Burba and Smith "ignored the reality of the progress of the Project and projected false but promising numbers related to the mine to investors." *Id.* Another witness alleged that there were "periodic presentations, meetings, and general discussions before July of 2012 with both the Molycorp senior management and the team on the ground in Mountain Pass" to discuss the status of Project Phoenix. *Id.* ¶ 97. At these meetings, issues began to pile up, "being constantly behind schedule [was] a theme at Mountain Pass," and "the problems with the Project were so pervasive that employees sometimes referred to the Company as 'Molymess.'" *Id.* Plaintiffs allege that "[b]ecause of these presentations, Defendants were aware that the Project was not progressing according to the announced schedule." *Id.*

---

[4] The Complaint reads "December 12, 2013." Comp. ¶ 121. The Court assumes this is a typographical error and that Plaintiffs intended to write December 12, 2012.

On January 10, 2013, when Phase 1 should have already been completed, Molycorp slipped the completion date for Phase 1 to mid-year 2013. *Id.* ¶ 122. In an interview that day, Karayannopoulos admitted to Bloomberg News that Molycorp's projected completion date for Phase 1 of fourth quarter 2012 was too aggressive, not realistic, and should not have been the expectation. *Id.* ¶ 124. That day, Molycorp stock fell to $8.34, a single-day loss of 22.7%. *Id.* ¶ 125. On May 9, 2013, in its 10-Q, Molycorp admitted that the project encountered delays in bringing the leach and multi-stage crack processes up to initial run rate capacity, which Plaintiffs allege directly contradicts Molycorp's February 23, 2012 statement that it had already succeeded in launching the leaching process. *Id.* ¶ 126. Molycorp also admitted that defective engineering work contributed to the delay. *Id.* ¶ 127.

## C. Marketability of SorbX

Forty-eight percent of the rare earth content of the Mountain Pass mine is cerium, which is a low-value rare earth metal. *Id.* ¶ 153. Cerium is priced low because "it is an abundant metal in ready supply that has few specialized applications in which it excels." *Id.* ¶ 155. In 2010, Molycorp developed a cerium-based filtration product called SorbX (originally named XSORBX) "in an attempt to build commercial potential for the large amount of cerium in the Mountain Pass mine." *Id.* ¶ 156.

In February 2012, Smith told investors on a conference call that 78% of Phase 1 was "being signed in customer agreement or reserved for XSORBX production. And with regard to XSORBX, we sold a total of 55 metric tons of this product last year. We anticipate sale[s rising] strongly in 2012 and beyond. . . . Indeed, we expect to sell approximately 1,000 tons of XSORBX product during 2012." *Id.* ¶ 159. Molycorp repeated these expectations, including a statement in its 2011 Annual Report released on May 6, 2012, which stated that "XSORBX

8

hold[s] the potential to revolutionize water treatment and purification, [and] also creates high-volume, high value end markets for the cerium produced at Mountain Pass. This greatly improves our cost competitiveness and shields us from traditionally lower cerium prices." *Id.* ¶¶ 162-63.

In its 10-Q, its Results of Operation and Financial Condition, and a conference call with investors, all on May 10, 2012, Molycorp repeated these SorbX sales goals and "emphasized that Molycorp's sales goals were realistic and attainable." *Id.* ¶¶ 164-67. In August, Molycorp told investors that the SorbX commercialization team was "on track with its development efforts, and our 2012 target of selling 1,000 metric tons of [SorbX] has not changed." *Id.* ¶¶ 168-69. In November 2012, Molycorp told investors that customer demand was beginning to stabilize and that the company had customer agreements in place or were in advance discussions with customers on the sales in excess of Phase 1 capacity. *Id.* ¶ 171. Doolan noted that Molycorp had made "significant traction on commercializing our XSORBX products." *Id.* In March 2013, Karayannopoulos announced a five-year agreement under which Univar, a distributor of industrial and specialty chemicals, would purchase SorbX for distribution to municipal and industrial wastewater facilities. *Id.* ¶ 175. He also stated that "if the SorbX volumes get to that point, pretty well the entire output of separated cerium from Mountain Pass will be dedicated to SorbX." *Id.* He also stated goals for Mountain Pass's cerium: by the end of 2013, he expected being sold out of the run rate capacity of cerium. *Id.*

Molycorp's 10-K filed on March 18, 2013, stated that the market for SorbX was not yet fully developed and that cerium, of which Molycorp would possess excess amounts if SorbX was not commercially accepted, was in global surplus and faced a significant price decline. Levin Decl., Ex. FF at 21, 24. Molycorp also warned investors that SorbX had not yet been sold or

9

fully commercialized. *Id.* at 24. On May 9, 2013, Karayannopoulos told investors that three municipal waste water trials for SorbX had been scheduled and one was complete. Compl. ¶ 177.

Five months later, in its October 15, 2013 8-K, Molycorp stated that it had "not yet realized meaningful market penetration" for SorbX or other products from the Mountain Pass facility and that Molycorp "continu[d] to expect that we will be unable to sell a substantial portion of our cerium production during 2014." *Id.* ¶ 179. That day, Molycorp's stock price fell 21.4%, to $5.58. *Id.* ¶ 180. A journalist explained the reasons for this drop, stating that Molycorp's announcement "shows . . . that Molycorp's rare earths might not be the great source that investors thought the company had." *Id.* ¶ 181. Molycorp allegedly "knew from the beginning of the development of SorbX that initially demand for the product would not be strong, and that building its market position would be a slow and difficult process." *Id.* ¶ 183. Plaintiffs allege that "if anybody within Molycorp was really paying attention and understanding that market, they would have known in 2012 . . . [and] certainly by late 2012 that SorbX had no short term potential of achieving market acceptance." *Id.* (internal alterations omitted).

In fact, a confidential witness alleges that Molycorp "knew about a year prior to the October 15, 2013 public announcement regarding cerium that SorbX sales were not going to be profitable and that cerium sales would not be meaningful." *Id.* ¶ 186. Confidential witnesses allege that, from May or June 2011 until at least the end of 2012, Molycorp was stockpiling SorbX in warehouses. *Id.* ¶ 188. Previously, Molycorp had a deal with the Russian government to buy SorbX, but the Russian government backed out of the deal towards the end of 2011 into 2012. *Id.* ¶ 189. Molycorp sold SorbX to itself from January 2012 to August or September 2012. *Id.* ¶ 190. The SorbX plant "never [did] what they had said it was going to do" and only operated at a tenth of the running rate necessary to "keep the damn thing running." *Id.* ¶ 193.

10

Moreover, issues with solvents in the material in several bags sent out by Molycorp meant that

these bags had to be returned, refiltered, and shipped back to customers. *Id.* ¶ 194. A

confidential witness alleges that employees "never saw much of [SorbX] leaving the plant." *Id.*

¶ 195.

## D.   Restatement of Financial Results

On May 9, 2013, Molycorp filed a 10-Q with the SEC for the period which ended March

31, 2013, signed by Karayannopoulos and Doolan. *Id.* ¶ 140. On August 8, 2013, Molycorp

announced that it would delay the filing of its 10-Q for the period ending June 30, 2013, and that

the May 9, 2013 10-Q should not be relied on because it:

> contained an error with respect to the reconciliation of its physical inventory to the
> general ledger, which resulted in a cumulative overstatement of cost of sales and
> understatement of current inventory of approximately $16.0 million. This error also
> caused the income tax benefit in the first quarter of 2013 to be overstated by
> approximately $6.5 million, the disclosure of the consolidated assessment of normal
> production levels to be understated by approximately $17.4 million, and the consolidated
> total write-down of inventory to be overstated by $18.0 million. . . . [These statements
> also] contained an error with respect to the accrual of certain severance charges, which
> resulted in an understatement of accrued expenses and selling, general, and
> administrative expense of approximately $2.1 million. This error also caused the income
> tax benefit in the first quarter of 2013 to be understated by approximately $0.8 million.

*Id.* ¶ 143. This information was important to investors because "if the increased production from

the Mountain Pass facility could not be sold, as was indicated by the growing stockpile of unsold

inventory, [Project Phoenix] would be a failed investment." *Id.* ¶ 145. From August 8 to August

9, 2013, following this disclosure, Molycorp stock declined 9.7%, dropping to $6.69. *Id.* ¶ 147.

This restatement was due to inadequate oversight and rushed inventory counting procedures. *Id.*

¶ 148. Plaintiffs allege that "[d]espite that Defendants were aware of the work environment at

the mine, and were aware that employees did not have adequate time or resources to

appropriately keep track of inventory, Defendants participated in the preparation and/or

11

dissemination of statements that were likely incomplete or inaccurate." *Id.* ¶ 150. The restatement ultimately decreased Molycorp's net loss attributable to shareholders by $8.3 million, from a net loss of $47,223,000 to a net loss of $38,971,000. *Compare* Levin Decl., Ex. H at 5 to Ex. EE at 5.

## E. Procedural History

On August 14, 2013, investors filed the first of two putative securities class action lawsuits. Dkt. 1. The second was filed on August 22, 2013. *See* 13 Civ. 5943. On April 2, 2014, the Court consolidated the two actions and appointed Gary Armstrong Lead Plaintiff. Dkt. 28. Plaintiffs filed the Consolidated Amended Complaint on May 19, 2014, which expanded the Class Period and changed certain defendants.

## DISCUSSION

## I. Applicable Law

### A. Pleading Standards

The Court "must accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the plaintiff, when considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The Court does not "assay the weight of the evidence which might be offered in support thereof;" it only "assess[es] the legal feasibility of the complaint." *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011) (internal quotation marks omitted).

Allegations of securities fraud, however, must meet the heightened pleading standards of Fed. R. Civ. P. 9(b): "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*ECA*"). Complaints alleging fraud must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

In addition to meeting the requirements of Fed. R. Civ. P. 9(b), a securities fraud complaint must meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). The PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind," with respect to each act or omission. 15 U.S.C. § 78u-4(b)(2). Thus, a securities fraud complaint must include facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. The Court will deem an inference of scienter strong if "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

## B. Claims Under Rule 10b-5

A successful claim under Section 10(b) of the Exchange Act and Rule 10b-5 requires that plaintiff establish each of the following elements: "' [defendants] (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of

securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.'" *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261, 265-66 (S.D.N.Y. 2014) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998)). In a 10b-5 action, the requisite state of mind is "an intent 'to deceive, manipulate, or defraud.'" *ECA*, 553 F.3d at 198 (quoting *Tellabs*). In the Second Circuit, a "strong showing of reckless disregard for the truth" satisfies the scienter element. *In re Puda Coal Sec. Inc. Litig.*, 30 F. Supp. 3d at 266. A defendant executive may be held accountable under Section 10(b) or Rule 10b-5 where the executive had ultimate authority over the company's statement, signed the statement, ratified and approved the statement, or where the statement is attributed to the executive. *Carpenters Pension Trust Fund v. Barclays PLC*, 2014 WL 5334053, at *6 n.59 (S.D.N.Y. Oct. 20, 2014) (quoting *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012)).

## C. The Safe Harbor Provision of the PSLRA and The Bespeaks-Caution Doctrine

The PSLRA contains a "safe harbor" provision, which protects "forward looking" statements from liability. The PSLRA directs that "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (emphasis in original); 15 U.S.C. § 78u-5(c). Similarly, the "bespeaks-caution" doctrine, a "counterpart" to the safe-harbor provision, protects "forward-looking statements that adequately disclose the risk factors that might cause a different outcome to occur than the one forecast by the issuer." *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 300-01 (S.D.N.Y. 2013) (citing *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 & n.8 (2d Cir. 2010)).

14

## II.    Analysis of Section 10(b) and Rule 10b-5 Allegations

Defendants argue that Plaintiffs' Complaint should be dismissed because (1) the relevant
statements were forward-looking and accompanied by meaningful cautionary language; were
non-actionable statements of opinion, corporate optimism, and puffery; and were not made with
actual knowledge that they were false or misleading; (2) Individual Defendants cannot be held
liable under Section 10(b) for statements they did not make; (3) the Complaint fails to plead a
strong inference of scienter; and (4) the Complaint does not adequately allege corporate scienter
of Molycorp.[5]  Moreover, Defendants argue that because Plaintiffs have not alleged an
underlying primary violation by either Molycorp or the Individual Defendants, Plaintiffs' Section
20(a) claim must fail.  *See* Def. Mem.[6]  Plaintiffs reject each of these arguments.  *See* Pl. Mem.

### A.  Project Phoenix

Although several of Defendants' statements regarding Project Phoenix constitute
forward-looking statements which merit protection under the safe harbor provision and the
bespeaks-caution doctrine, Plaintiffs have failed to demonstrate that these statements were made
with the required scienter, and this issue is dispositive of all allegations regarding Project
Phoenix statements.  Accordingly, the Court does not distinguish between those statements that
are protected by the safe harbor provisions and those that are not.

---

[5] Defendants briefly suggest that Plaintiffs have insufficiently pled reliance and have failed to allege "that each
alleged misrepresentation actually affected the price of Molycorp stock." Def. Mem. at 7 n.8. Plaintiffs incorrectly
state that "Defendants challenge only the first two elements [of a 10b-5 action, that is, material misrepresentation or
omission and scienter] and thus have waived any challenges to the others." Pl. Mem. at 5. Since the Court's finding
with respect to these first two elements is dispositive of the case, the Court does not address Defendants' arguments
about Plaintiffs' reliance allegations.

[6] Defendants also argue that Plaintiffs' Complaint fails to meet the requirements of the PSLRA and Fed. R. Civ. P.
9(b) because the Complaint simply makes "a single boilerplate, conclusory allegation of falsity" after each set of
alleged misstatements and that this makes it impossible to discern specifically why each particular statement was
false or misleading when made. Def. Mem. at 8-9. The Court, however, finds that the structure of Plaintiffs'
Complaint is not a basis for dismissal of the Complaint.

15

As discussed above in Section 1.A (pp. 12-13, *supra*), with respect to scienter, Plaintiffs must allege facts demonstrating that defendants either had motive and opportunity to commit the alleged fraud or constituting strong circumstantial evidence of conscious misbehavior or recklessnesss. *ATSI*, 493 F.3d at 99; *accord Stratte-McClure v. Morgan Stanley*, 2015 WL 136312, at *10 (2d Cir. 2015). To prevail on a showing of motive, Plaintiffs must plead more than simply "motives that are generally possessed by most corporate directors and officers;" "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *see also Bd. of Trs. of City of Ft. Lauderdale Gen. Emps' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 867 (S.D.N.Y. 2011) (finding that a "unique connection between the fraud and the [benefit]" must exist). Here, Plaintiffs have failed to allege motive, and do not dispute Defendants' contention that they fail to so allege.

Pleading a conscious misbehavior or recklessness theory comes with an attendant stricter standard. *See In re Citigroup Sec. Litig.*, 753 F. Supp. 2d 206, 233 (S.D.N.Y. 2010) ("'Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of circumstantial allegations must be correspondingly greater.'") (quoting *Kalnit*, 264 F.3d at 142). A finding of recklessness requires a showing of "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious the defendant must have been aware of it." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (internal quotation marks and citations omitted). Several "important limitations on the scope of liability for securities fraud based on reckless conduct" exist, including that "allegations that defendants should have anticipated future events and made

16

certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud," and that "as long as the public statements are consistent with reasonably available data, corporate officers need not present an overly gloomy or cautious picture of current performance and future prospects." *Id.*; *accord In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at \*13 (S.D.N.Y. Jan. 14, 2013).

Plaintiffs' allegations fail to meet this high burden. First, a close analysis of the allegations of confidential witnesses reveals that the Complaint does not actually come close to alleging Defendants' knowledge of delays at the mine until, at the earliest, June 2012. For example, CW5 alleges that "by August of 2012, management realized that the process as designed would not work." Compl. ¶ 53. CW5 also alleges that "this information [that the leach process was only running at a tenth of its capacity] was presented to Defendants Karayannopoulos and Burba . . . in January of 2013." *Id.* CW1 asserts that when he was hired in July of 2012, Project Phoenix was "'a mess.'" *Id.* ¶ 72. CW3 alleges that "in June or July of 2012, the Mountain Pass power plant, which was built to power the Project, only ran for a few hours at a time." *Id.* ¶ 81. CW4 "stated that the rare earth mine was shut down for one and a half months in the last quarter of 2012, thereby making it impossible to meet the Phase 1 target date." *Id.* ¶ 85. The same witness alleged that the mine did not receive a major piece of equipment for the "Chloro Alkali plant until January or February 2013." *Id.* ¶ 87. He also stated that between June 2012 and November 2012, Burba was on site on a monthly basis and was apprised of the site problems, "including the obstacles to meeting Project Phoenix deadlines." *Id.* ¶ 88.

None of these claims even suggest Defendants' awareness of the problems prior to June 2012.[7] Accordingly, this dearth of scienter allegations means that a large portion of the statements which Plaintiffs allege are actionable, made during February and May, are patently not actionable. Plaintiffs' attempt to rely on allegations regarding the defects in the work performed by M&K to demonstrate scienter during this time fails because the allegations do not present a compelling inference of the requisite state of mind. That poor work was done and that the damages were significant enough for Molycorp to sue M&K does not mean that Molycorp knew its proposed schedule was no longer viable. It is equally as likely, and indeed more compelling, that Molycorp believed it could remedy this damage within the existing time frame, particularly because Molycorp had numerous contractors and sub-contractors working on Phase 1, and sought to repair the damage swiftly. *See* Compl. ¶ 107.

With respect to Defendants' statements in August, November, and December 2012, Plaintiffs' allegations still do not suffice to provide strong circumstantial evidence of conscious misbehavior or recklessness. The remaining allegations from confidential witnesses are equally devoid of facts demonstrating that Defendants knew they would fail to meet the announced schedule when the statements were made. For example, even if it is true that "by August of 2012, management realized that the [leaching] process as designed would not work," Plaintiffs fail to show that Defendants should not have believed that its instruction to engineers to "redesign the leach process and to build the redesigned process quickly," Compl. ¶ 53, was feasible and would ensure completion on the previously-stated timetable. Likewise, Plaintiffs' allegation that Defendant Burba "was apprised of site problems," Compl. ¶ 88, in addition to

---

[7] With respect to the allegation that there were periodic meetings before July of 2012, Compl. ¶ 97, these allegations do not specify which, if any, defendants were there, and what, if any, information was discussed regarding delays that would prevent the completion of Project Phoenix on the announced timetable. Likewise, the allegation that "[b]y early 2012, Defendants knew that there would be delays to Phase 1," Compl. ¶ 67, is wholly conclusory.

18

being largely conclusory, also suggests the more compelling inference that Burba simply believed these problems could be overcome within the announced timeframe. These allegations may show "'that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud.'" *In re Agnico-Eagle Mines*, 2013 WL 144041, at *15 (quoting *Shields v. CityTrust Bancorp., Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994)); *accord S. Cherry Street, LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110-11 (2d Cir. 2009) ("To meet the 'strong inference' standard, it is not sufficient to set out facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent.") (quoting *Tellabs*, 551 U.S. at 314) (internal quotation marks omitted).

Plaintiffs' allegation that numbers were reported to Smith and that Smith was in turn reporting false numbers to investors is too conclusory to support a finding of scienter. Compl. ¶¶ 88, 100-01. Plaintiffs do not point to specific, existing reports that were given to Smith, nor does the confidential witness allege that he directly spoke to Smith or Burba or was present when such information was conveyed. *See In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272-73 (S.D.N.Y. 2009) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information to indicate how it was inconsistent with the statements made.").

While Plaintiffs argue that Defendants must have known of the delay in completion of Phase 1 prior to its announcement on January 10, 2013, "[m]anagers . . . are entitled to investigate for a reasonable time, until they have a full story to reveal." *Higginbotham v. Baxter Int'l., Inc.*, 495 F.3d 753, 761 (7th Cir. 2007); *accord Kinross*, 957 F. Supp. 2d at 304 ("Although today it is known that the schedule was not met, [Plaintiff] has not sufficiently alleged that defendants [at the time the statements were made] knew or were reckless in setting

or adhering to that schedule.").[8]  Just because something is wrong or incorrect as a matter of fact

does not mean it was reckless.  Likewise, Plaintiffs' assertion that Karayannopoulos admitted

that Phase 1 timelines were not realistic, and that this constitutes an admission that Defendants'

prior statements had been reckless, must fail because recklessness and erroneousness are not

equivalent.  While Plaintiffs argue that "'the Court does not need to identify the precise moment

at which the culpable inference overtook the innocent one,'" Pl. Mem. at 15 (quoting *In re ITT*

*Educ. Servs., Sec. Litig.*, 34 F. Supp. 2d 298, 310 (S.D.N.Y. 2014)), here, Plaintiffs have failed to

show that a culpable inference ever overtook an innocent one.  Because Defendants eventually

disclosed the delay, Plaintiffs' position, that these statements should be found actionable, "would

impose too high a burden of clairvoyance and continuous disclosure on corporate officials."  *In

re Agnico-Eagle*, 2013 WL 144041, at *19.

In its entirety, Plaintiffs' allegations regarding Project Phoenix read as a classic example

of "fraud by hindsight."  *See In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*, 2012

WL 1353523, at *9 (S.D.N.Y. Apr. 12, 2012) (criticizing the practice of pleading "a

retrospective critique" of Defendants' actions) (citing *Novak*, 216 F.3d at 309).  Plaintiffs

respond to this argument by merely citing precedent holding that allegations of

misrepresentations and omissions that were misleading and false at the time they were made do

not constitute fraud by hindsight.  Pl. Mem. at 14-15.  But, as Plaintiffs have failed to show that

Defendants' statements were made with the required scienter, Plaintiffs have also failed to show

---

[8] Plaintiffs argue that *Kinross* ultimately supports their scienter argument because there the Court found two statements actionable, finding that Defendants ultimately should have known of delays that would affect the projected schedule. Pl. Mem. at 17. But in *Kinross*, Plaintiffs had sufficiently alleged that Defendants had to have known that their predicted schedule would not be met, under circumstances that do not exist here, such as "concrete facts known to Kinross, but not the public, . . . that made it all the more likely that the old construction schedule could no longer realistically be met." 957 F. Supp. 2d at 306-07. Moreover, in *Kinross* the information that arose made it clear that Defendants' projected schedule would be impossible to meet; here, Plaintiffs have failed to show that any facts existed at the time Defendants made the challenged statement that demonstrated that the schedule was *impossible* to meet.

that they are not simply pleading fraud by hindsight. *See, e.g., Kinross*, 957 F. Supp. 2d at 304

("To permit [plaintiff's] claim to go forward based on [Defendants'] later abandonment of the

schedule would effectively permit plaintiffs to allege 'fraud by hindsight.'").

Plaintiffs urge the Court to take a "holistic[]" view of the scienter allegations and to

consider in support of a demonstration of scienter the facts that the financials were SOX-

certified; that Project Phoenix was a "core operation" of Molycorp; and that certain Individual

Defendants were "forced" to resign during the class period. Pl. Mem. at 21, 22-24. In support of

this argument, Plaintiffs cite *In re Atlas Air Worldwide Holdings Inc. Securities Litigation*, 324

F. Supp. 2d 474 (S.D.N.Y. 2004), which found Defendants liable under Rule 10b-5 and

considered allegations of scienter buttressed by the fact that Defendants provided signatures and

certifications pursuant to SOX, *id.* at 492. But in *Atlas Air*, unlike here, confidential witnesses

specifically alleged that a named defendant was in possession of the results of a specific

corrected inventory and that prior to the disclosure of the financial misstatements, a confidential

witness overheard a manager of revenue accounting state that the company had failed to write

down debts that should have been written off. *Id.* at 492.

Such allegations, directly tying defendants to knowledge of the falsity of financial

statements, are lacking in the instant case. Accordingly, in the absence of more particularized

allegations of scienter, that certain Defendants signed or certified SEC disclosures is insufficient

to support a finding of scienter. *See In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 589-90

(S.D.N.Y. 2010). Likewise, without factual allegations linking Defendants' resignations to the

alleged fraud, the mere fact of the resignations provides no support for a finding of scienter.[9] *See*

*In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012). With respect to

---

[9] Plaintiffs' bare allegation regarding an industry analyst's statement that Smith had "lost credibility," Compl. ¶ 120, is not sufficient to link Smith's resignation to the alleged fraud.

Plaintiffs' argument that the "core operations" doctrine provides support for a finding of scienter here, Compl. ¶ 135; Pl. Mem. at 22-23, while the Second Circuit has "expressed some support for the idea that the core operations doctrine survived the enactment of the PSLRA in some form," the majority approach has been to consider such allegations as a "supplementary but not independently sufficient means to plead scienter." *Johnson,* 2013 WL 214297, at \*17-18 (S.D.N.Y. Jan. 17, 2013) (quoting *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011)). In light of the fact that there is no other basis for finding scienter here, Plaintiffs' core operations allegations are inadequate to provide such support.

For the foregoing reasons, Plaintiffs have inadequately pled scienter with respect to the Project Phoenix statements, and accordingly Plaintiffs' claims based on these statements are dismissed.

## B. Statements Regarding SorbX

With respect to the allegations of fraudulent statements regarding SorbX, Plaintiffs allege that Defendants' statements are not protected by the safe harbor provision or the bespeaks-caution doctrine because these doctrines do not protect "statements based upon historical or current fact, or contradicted by contemporaneous knowledge of the statement's falsity." Pl. Mem. at 6. Even if protected by these doctrines, Plaintiffs argue, "even truthful announcements of apparent business successes—like those at issue here—give rise to a duty to disclose known related problems." *Id.* at 7. Plaintiffs also allege that the statements concealed known risks, do not constitute inactionable opinion statements, were too specific to constitute puffery, and were made with scienter.

22

These arguments fail in light of the fact that Plaintiffs have not shown that these forward-looking statements were made with actual knowledge that the statement was false or misleading when made. The majority of statements regarding SorbX identified in the complaint are "classically forward-looking—they address what defendants expected to occur in the future." *In re Sanofi Sec. Litig.*, 2015 WL 365702, at \*19 (S.D.N.Y. Jan. 28, 2015). For example, that Molycorp "expect[ed] to sell approximately 1,000 ton of XSORBX product during 2012," Compl. ¶ 159, and believed that "achieving the internal target penetration rates [was] very realistic," *id.* ¶ 166, reflects the company's future intentions and expectations for SorbX. *See Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at \*15 (S.D.N.Y. Jan. 17, 2013).

Plaintiffs' allegations regarding Defendants' knowledge that SorbX sales would be lower than previously stated fail to present a strong inference of actual knowledge. "The scienter requirement for forward-looking statements—actual knowledge—is stricter than statements of current fact.'" *In re Sanofi*, 2015 WL 365702, at \*14 (internal citations omitted). Here, Plaintiffs' allegations of Defendants' knowledge are both speculative and conclusory. For example, the allegation from a confidential witness that if anyone in management was "paying attention," they would know by late 2012 that SorbX had no short term commercial potential, does not meet this standard.

Nor do the following allegations marshaled by Plaintiffs in an attempt to demonstrate Defendants' actual knowledge of the falsity of the SorbX statements: (1) that Burba was involved in all operations at the mine; (2) that a former Main Project Manager and Shift Supervisor told a confidential witness that executive management already knew the sales of SorbX would not be productive; (3) that Smith or the Head of Shift Foremen would have known about the SorbX problems because "CW9 was told that the information was passed down to

CW9 from the 'top;'" and (4) that SorbX was being stockpiled in warehouses, previously had a buyer in the Russian government who backed out, and that Molycorp was selling SorbX to itself. Compl. ¶¶ 183-196. None of these allegations provide support for the assertion that Defendants had actual knowledge of SorbX's likelihood of failure in commercial markets at the time the forward-looking statements were made. While Plaintiffs seize on the fact that Molycorp's October 15, 2013 8-K acknowledged that Molycorp "continue[d] to expect that we will be unable to sell a substantial portion of our cerium production during 2014" as evidence that "Defendants knew these adverse SorbX facts substantially earlier than the date of this Form 8-K," Compl. ¶ 179, this statement is ambiguous, Plaintiffs' interpretation of it is speculative, and Plaintiffs have not presented allegations that compel a finding that this statement demonstrates Defendants' actual knowledge of the problems with SorbX's commercial potential. Even if the Court were to find that this statement demonstrated that Defendants were aware of these problems prior to the announcement, it certainly fails to suggest that Defendants had this knowledge when the allegedly misleading statements were made. [10]

Plaintiffs argue that Defendants' statement that "We also believe that we're on the path for market acceptance of XSORBX into drinking water purification markets," Compl. ¶ 159, is not forward-looking. Pl. Mem. at 7. The Court finds that this statement is forward-looking, as it clearly identifies future intentions and includes language signaling a forward-looking statement, and is accordingly protected by the safe harbor provision.[11] *See Johnson*, 2013 WL 214297, at

---

[10] Plaintiffs' assertion that the Complaint's allegations demonstrate that Defendants knew of problems with SorbX's marketability is further weakened by its statement that "due to product demand," Molycorp increased the price of SorbX. Compl. ¶ 189. It is unclear how Defendants could simultaneously have been aware that SorbX would not meet commercial success while increasing the price of the product due to demand.

[11] Even if the Court were to find this statement not forward-looking, Plaintiffs have failed to demonstrate Defendants' scienter with respect to this statement. Plaintiffs do not even suggest that Defendants knew of problems with sales of SorbX in February 2012. *See, e.g.*, Compl. ¶ 186 ("CW9 related that Molycorp management knew about a year prior to the October 15, 2013 public announcement regarding cerium that SorbX sales were not going to be profitable.").

24

\*15 (citing *Slayton*, 604 F.3d at 769).

The remaining statements regarding SorbX constitute non-forward-looking statements, which are not actionable, however, because they contain statements of historical fact, the truth of which Plaintiffs have not disputed. For example, Plaintiffs have not disputed the truth of Molycorp's statement that "[i]n 2011, we began to realize the full extent of XSORBX's capabilities and the prominent role the technology will play in Molycorp's future." Compl. ¶ 163. Nor have they alleged that Smith's statements regarding "a customer from last year that tested our product" and is planning to take more, made in the May 10, 2012 conference call with investors, was false. *See id.* ¶ 167. Plaintiffs' allegations fail to provide a basis for finding any of Defendants' SorbX statements actionable, and accordingly the claims relating to SorbX are dismissed.

## C. Financial Restatements

Plaintiffs' allegations regarding Defendants' financial restatements also fail to meet the required pleading standards. Defendants challenge these allegations on the grounds that Plaintiffs have failed to demonstrate Defendants' scienter with respect to the misstatement. Def. Mem. at 22. Defendants also note that the restatement "*decreased* the Company's net loss attributable to shareholders by approximately \$8.3 million." *Id.* at 6.

Plaintiffs allege that "[f]ormer Molycorp employees confirm that the Company's restatement of earnings was due in large part to inadequate oversight and rushed inventory counting procedures on the part of Defendants and other Molycorp executives." Compl. ¶ 148. The Complaint includes statements from confidential witnesses that the inventory was improperly managed and organized, stored in ways that could compromise its quality or effectiveness, and that the operating conditions were "'just chaos.'" Compl. ¶¶ 148-49.

Additionally, a confidential witness stated that Burba, who was "involved with all of the operations of the mine," reported numbers directly to Smith. *Id.* ¶ 150.

But these allegations from confidential witnesses are insufficient allegations of scienter and fail to demonstrate that Defendants had the requisite state of mind for the restatement to be actionable. It is "well settled that mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter." *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472-73 (S.D.N.Y. 2008) (noting that "[m]istakes . . . happen a lot in the third grade, and sometimes they happen in public companies, too. There is no reason to make a federal case out of it.").

The allegations of the confidential witnesses regarding inadequate storage, inventory, and oversight fail to demonstrate that any Defendant knew or had reason to know, or were reckless in not knowing, that the numbers in the original 10-Q were incorrect. *See id.* at 473 ("While various confidential informants assert that knowledge of weaknesses in the accounting department was 'widespread' at [defendant company], not a single informant offers any information from which one could infer that . . . individual defendants knew or had reason to know anything about [the erroneous numbers]—except by virtue of their purported status as 'hands on' senior executives.'"). Moreover, for the same reasons as discussed above, Plaintiffs' arguments in support of a holistic view of scienter, buttressed by inferences from the Defendants' signatures, certifications, and resignations, are rejected. Accordingly, Defendants' motion to dismiss the claims based on the financial restatement is granted.

## D. Corporate Scienter

Plaintiffs' insufficient allegations of individual scienter extend to its allegations of corporate scienter. *See Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F.

Supp. 2d 479, 503 (S.D.N.Y. 2013) (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). While Plaintiffs argue, and are correct, that "it is possible to raise the required inference [of corporate scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant," Pl. Mem. at 25 (quoting *Dynex*, 531 F.3d at 195), here Plaintiffs' allegations provide no basis for such a finding of corporate scienter, *see In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 329 (E.D.N.Y. 2013) (providing examples for showing corporate scienter without finding individual scienter). Accordingly, Plaintiffs' Section 10(b) claims against Molycorp are dismissed.

### E.  Analysis of Section 20(a) Claim

Plaintiffs' Section 20(a) claim, Count 2 of the Complaint, must be dismissed in light of the failure to allege a primary violation by an individual defendant. *See Slayton*, 604 F.3d at 778; *ATSI Commc'ns*, 493 F.3d at 108.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint is granted.  The Clerk of the Court is directed to terminate the motion at Docket Number 40 and close this case.

Dated: New York, New York
       March 12, 2015

SO ORDERED

PAUL A. CROTTY
United States District Judge